Good morning, Your Honors. David Cook for the appellants with me today is Stuart Block. I'd like to, I'll be reserving about four or five minutes for rebuttal. I have the clock. Thank you, sir. This appeal presents two essential questions, Your Honors. The first is, what environmental liabilities did the buyers and sellers of this solvent recycling business intend to address in their merger agreement that they entered into 15 years ago? Were they the unknown as well as the known environmental liabilities of that business? That's what we say. Or were they the environmental liabilities associated with the business where it was located at the time of the merger in 1990, on Berryessa Road? That's what Union Pacific says. That's what the district court held. That's the first question. The second question is a question the district court did not get to because of the way it resolved the first one, which is how does this agreement, as it was drafted, actually operate to allocate unknown environmental liabilities such as the one at the Industrial Avenue address where this business was first conducted from 71 to 74? Counsel, I read the agreement, and I couldn't find any reference to Industrial Avenue whatsoever. Give us some background. Why is that? The Industrial Avenue address was the occupants the occupied location of the partnership solvent service from 1971 to 74. They moved from Industrial Avenue to the Berryessa Road facility in 74, incorporated in 80, and sold in 90. It was not mentioned. We don't know exactly why it was not mentioned in the agreement, but we do know that it was mentioned in the agreement by reference. Where? In paragraph 3.17, section 3.17, which appear and there's an attachment to the brief. It appears on page, excuse me, page 27. Section 3.17 is a series of environmental representations and warranties in this agreement. And it says, except as set forth on the accompanying schedule, which has the same number, schedule 3.17, a series of representations and warranties are made by the shareholders and former partners, my clients. If you turn to page 28 at Romanet 2 near the top, the third line, it says, quote, there are no conditions existing on any of the properties currently owned or occupied or formerly owned or occupied by the company that require remedial action, removal or closure by the company under any environmental law. Now the ---- Your argument is that notwithstanding its failure to be included expressly, the term formerly owned would include the Industrial Avenue property. It actually would be formerly occupied. It was a leased property, but it would be formerly occupied. Formerly occupied.  And the ---- what the district court did is, and we believe that the fundamental error of the district court is that it determined what the mutual intent of the parties was to ---- and it was to be limited to the activities at the Berryessa Road address solely by virtue of the reference to that one fact of the extrinsic evidence, which was that during the period of the premerger due diligence activities, the existence of the Industrial Avenue address was not specifically mentioned in the discussions. Notwithstanding, we have language that refers to formerly owned or occupied properties. That language, according to the lawyer who drafted it, who worked for Union Pacific, Mr. Patrizia, was put there as a ---- because it was considered, he considered it state-of-the-art ---- Can you say formerly owned, formerly employed by Union Pacific? Yes. He was, he was ---- Or occupied. Formerly occupied. Excuse me. I'm sorry. The lawyer who was formally employed by Union Pacific? He was the lawyer who negotiated this contract, a man by the name of Charles Patrizia. Okay. He drafted this language. He said that during the course of the negotiations, he asked the former partners whether or not there was a formerly occupied property. His testimony was that they said there was not. That's disputed. That's a disputed fact in the record. Now, are we allowed to peek at that, or do we have to confine ourselves under California law to the language of the agreement? We believe, Your Honors, that the language of the agreement is sufficiently clear and explicit, the use of the word formerly occupied by the company, that you don't have to look at the extrinsic evidence. But if you do look at specifically at the language of the contract, you can't and you don't go to the extrinsic evidence of the disclosures and the discussions that underlie it, then you have to decide that you must reach the conclusion that Industrial Avenue was a formerly occupied property by the company. The only question is what was the company. And we believe that everybody's agreeing in practice that the company, for the purposes of disclosures, was both the partnership and the corporation. However, Your Honor, if we were to go back into the extrinsic evidence to see what was the – what were the negotiations, what was actually said between the parties that places this nondiscussion about the Industrial Avenue address in context, there's a lot of – there's a lot of extrinsic evidence that is, in fact, conflicting about that, if the Court were to find this to be ambiguous. Well, if it is ambiguous, what would be the other meaning? Ambiguous means two – two meanings. Which – what would be the alternative? I don't know of any alternative meaning for this. The only area of ambiguity in this rep and warranty that I've been able to see is the specific reference to a defined-term company. The company is defined in the preamble to the agreement as the corporation. However, during the course of the negotiations, reps and warranties, including in the accompanying Schedule 3.17 that's the companion to this rep, there are representations and warranties about activities of the partnership. And those activities of the partnership are activities where the partnership was actually operating, in this case, at the Berryessa facility from 74 to 80. And during that period of time, there was contamination at the Berryessa facility by the partnership. Partnership, in fact, an antecedent entity to the corporation? In practical effect, yes. We don't contend that it is the legal predecessor or contend that the corporation is the legal successor for successor liability purposes to the partnership. But in practical effect, yes, Your Honor. The – from 1974 to 1980, the business was conducted as the Solvent Service Company Partnership. In 1980, it incorporated. The business activities became the business activities of the Solvent Service Company, Inc., the corporation. The partnership's role at that point was essentially relegated for the next 10 years to providing financing because the individual partners had the financial wherewithal to do that. Counsel, I'd like to go back to where I thought Judge Goodman was taking you, and that is trying to understand the role of extrinsic evidence and parole – the parole evidence rule in California. As I understand the law, and correct me if I'm wrong, the court may look to extrinsic evidence in order to determine the intent of the parties in assessing the meaning of the terms that are used in the contract so long as those terms are susceptible to a reasonable interpretation based upon the extrinsic evidence. Is that correct? That's the Thomas Dreyage and Riggin case. Right. Yes, Your Honor. Okay. All right. And were you content that Judge Fogel erred here was in looking at extrinsic evidence and concluding that the – that nobody was thinking about the Berryessa Road property in ruling against your clients? We – that's very close, Your Honor. We contend, actually, that there are two errors in what Judge Fogel did. The first error was to consider that the language in 3.17 Romanet II is reasonably susceptible of an interpretation that it doesn't apply to formerly-occupied properties. Which I think is what I was trying to say, although not as clearly as you just said. Thank you. Thank you. The other error – excuse me. Could I just direct you for a moment to the agreement? I'm looking at page 53 of the agreement. I think it's 878 of the excerpt of record. Sub 9, I guess it's sub 9 of definitions. The definition of shareholder environmental liabilities? Yes. I see a passage. It covers any and all covered liabilities of the company for the time being and including any predecessor or successor of the company, whatever its legal form, close paren. Is there any reference to predecessor – any other reference to predecessor in the rest of the agreement? That language appears again in paragraph – the preceding page in a definition of something called covered business liabilities about midway on page 52 of the agreement. Right. Now, is that instructive in any way? It is instructive, Your Honor. And Judge Fogel agreed that we had presented at least a genuine issue of material fact that that parenthetical means the partnership. And we've not seen any indication from Union Pacific as to any alternative meaning for that paragraph other than the partnership. I believe that they say it's boilerplate. I don't think this can be characterized as boilerplate having been crafted for this agreement and inserted in it in the way it was. Is there any other contending predecessor? There is no other contending predecessor. There are no candidates for predecessor or successor of the company, whatever its legal form, other than the partnership. The drafting history, we believe, also supports that as well. What's the second error? Pardon me, Your Honor? What's the second error? The second error is having made the decision to look at extrinsic evidence, the judge ignored the conflicting extrinsic evidence about the mutual intent of the parties with respect essentially to the subject matter of this agreement. There was one fact that the Court analyzed in considering whether or not the agreement reaches formerly occupied properties like Industrial Avenue. And that was the fact that it was not specifically discussed. That's the fact that Judge Fogel paid attention to. But there are other factors that place that in context that we believe that if that is indeed an issue, is the scope of this agreement actually reach properties other than Berryessa? That is clearly a triable issue of material fact. And the reason for that is that there are factors on both sides. In addition, I will give Union Pacific credit for the fact that it was not discussed. We are not contending that it was specifically discussed. We – they have testimony that, as Mr. Patrizia testified, that he was told that there were no such currently or formerly owned or occupied properties. That's what he says, but it's contested in the record. The due diligence team from USPCI takes the position, or the U.S. UP takes the position, that the due diligence team read some documents that they think now told them that the business started in 1974, which was the same year that they knew that they had started business at Berryessa. We don't think the documents actually say that. We think those documents that they got suggest that the business at Berryessa started in 1974, not that the business started in 1974 at Berryessa. That's, of course, a critical issue. Alitoson, what is some reference to a 1971 date in the record? There are references. This is a small business, Your Honor. These – it's not in the record. My clients are relatively unsophisticated businessmen. There are references to a lot of dates when this business started. Nineteen – there's a 1969. There's a 70, a 71. It is definitely not consistent throughout, but there are a number of indications that would put a reader at least on notice to ask. What is most significant now is that they did ask. The question whether or not formerly occupied properties was within the subject matter of this contract is made clear by Mr. Patrizia's own testimony, because he did ask. He did ask. And he asked – it – I don't understand how it can be said by Union Pacific that Union Pacific was not on inquiry notice of the existence of previously occupied properties when Union Pacific inquired. They did, in fact, inquire. And having inquired, they – he says that he was told that there were no such properties. Again, that's contested. He also testifies, and this is in the supplemental excerpts that Union Pacific filed at pages 201 to 202, Mr. Patrizia says that even though he had been told, he said, that there were no formerly occupied properties, he left that term, that rep and warranty, in the agreement. Anyway, he left it in the agreement, and he said he did so as additional protection for his client. So from the very get-go, this contract clearly embraced environmental liabilities at properties, whether they were specifically identified or not, so long as they were currently or formerly owned or occupied. Now, one of the – I have a few minutes left. Let me attempt to address a couple of issues about how the agreement actually operates once we have a rep and warranty. What makes this agreement a little bit unusual is the way in which it allocates unknown environmental liabilities or unanticipated environmental liabilities. Parties allocate unanticipated or unknown liabilities all the time. The way that these parties did it was to have the partners make representation – representations and warranties that certain facts were true, except as scheduled on the accompanying schedule. The accompanying schedule, if the accompanying schedule does not include a specific condition, for example, of requiring remediation, then that omission is a breach. And the way the contract works is the liabilities that are allocated through the cross-indemnities in this agreement are the exclusive – the indemnities provide the exclusive remedy for any breaches, except to the extent that a breach is knowing and intentional, that is to say if it's the product of fraud, which we don't think Union Pacific is contending. In fact, they don't say that. They say that they're not contending that. So we think that the omission of a reference to industrial avenue conditions, and that's all they were required to represent about former properties, by the way, is conditions, not addresses. If the omission of references to conditions about environmental remediation requirements at formerly occupied properties, in this case, becomes a breach because it was omitted. When it becomes a breach, it falls into the basket of shareholder environmental liabilities that Judge O'Scanlan pointed out. Once it's in that basket, it's handed back and forth, effectively, under the rest of the indemnity provisions, shared for a period of time, but ultimately by 1995, or when a secured portion of the former partner's obligations for this are escrowed, and when that escrow runs out, it falls squarely within the scope of UP's obligations. And that's where it is today, and that's where we believe it should have been placed by the judge. We think that if the Court agrees that the language is clear enough on its face, then it's not necessary to look at extrinsic evidence about the scope of this contract. Alito, back to my question. If I were to agree with you that the language is clear on its face, does California law still permit Judge Fogel to look at extrinsic evidence in order to test whether or not the terms used are ambiguous or not? Yes. I think it probably he probably could do that. But if they're not ambiguous on their face, then what is the point of looking at extrinsic evidence to see that? However, there is law that allows a court to look at extrinsic evidence to see if there's an ambiguity in a contract. We don't think there's anything ambiguous about the words formally occupied. I'm going to reserve the remainder of my time for rebuttal. Thank you. Thank you, counsel. Good morning, Your Honors. I'm John Barg. May it please the Court. I represent Union Pacific Corporation in this case. I think, may I start this way? Judge O'Scanlan, I think, asked exactly the right question. Where in the agreement is there a reference to Industrial Avenue? And Mr. Cook says that there is only a tangential reference that he relies on. And that tangential reference is in the Environmental Matters Section 3.17. He referred the Court to page 28, and he read that portion. And it says, there are no conditions existing on any of the properties currently owned or occupied or formerly owned or occupied by the company. And he concedes that the company means the corporation. Well — But, no, he said that it could also mean the partnership. Well, in the agreement, it's defined as the corporation. Right. Your Honor, I realize he — I heard him say that the parties also agreed that it included the activities of the partnership, at least with respect to Berryessa Road. Well, I know that he believes that all the parties agreed with that. But here's where I'm coming from, Your Honor. Union Pacific acquired the company. It did not acquire the partnership. Well, it's not quite that simple, Mr. Barg. But, Your Honor, I know it's a complicated agreement, but it's not necessarily a complicated case. Well, it's — I guess what troubles me about where I think you're going with this argument is that, as I understand the state of the record, it was the partnership who owned the Berryessa Road property and leased it to the company. Precisely. So when UP acquired the company, it certainly intended to acquire the rights to continue operating the company at that location, right? Correct, Your Honor. And what happened to the partnership interest in the property? Was that transferred to the company or to UP or whatever the acquiring entity was? Or did they continue to make payments to the individual owners of the property? The partnership, Your Honor, continued to exist, but the partnership had transferred to the corporation the Berryessa Road property, the four adjoining parcels of property, and various other properties. So that Union Pacific, in acquiring the company, acquired those assets as well and the liabilities associated with those assets. But I want to distinguish that situation, Your Honor, from Industrial Avenue. Industrial Avenue was never owned by the company. Indeed, the company that Union Pacific acquired did not even exist until 1980. Well, now, wait a minute. It certainly was occupied. It may not have been owned. It may have been leased, but didn't the predecessor occupy Industrial Avenue? Your Honor, Industrial Avenue was leased by and occupied by the partners. Right. From 1971 to 1974. Right. But the corporation that the partners created did not come into existence until 1980. So when we ---- So the partners occupied Industrial Avenue for three years and then moved to Berryessa as a partnership and occupied that for another six years. Correct. All right. So what's your point? I'm not following you. My point, Your Honor, is that on page 28 of the agreement, which Mr. Cook says is the only tangential reference to prior occupied property, it is property previously occupied by the company. And the company didn't even exist when Industrial Avenue was occupied by the partners. That can't be right because the U.P. would want protection from any environmental remediation claims that were brought against the Berryessa Road property from 1974 to 1980 or 1971 to 1980 before there was a formal incorporation, wouldn't it? You bet, Your Honor. But Berryessa Road and the partnership's involvement and transfer of that property to the company that was being acquired by Union Pacific was fully disclosed. It was part of the allocation and so on and so forth. There's no question about that. I guess let me ask you a question that really troubles me about what happened here, and that is, it seems to me that there was a serious problem with due diligence on the part of Union Pacific's counsel in two ways. One, I don't understand why there wasn't an express provision in the agreement that asked for a representation by the sellers that operations had never been conducted at any other location or that the operation had only been conducted at Berryessa. And secondly, why, in the face of the suggestion that there might have been something going on at Industrial Avenue, there weren't further inquiries during due diligence to find out what had gone on at Industrial Avenue? Well, Your Honor, the environmental problems with Industrial Avenue did not come to light until well after this merger agreement. I understand that. And I don't hear either side arguing that there was any intentional attempt to hide Industrial Avenue because apparently nobody had any reason to think that there might be a circular problem with that property at the time this deal was negotiated. At this point, Your Honor. But I guess my question really is a more fundamental one of, you know, I don't want to use the wasn't there basically a failure to meet the normal standards that one would expect in due diligence here in adequately investigating what this business had been doing before 1980? You know, I don't think so, Your Honor. I think there are some disputed facts with respect to exactly what was asked and what was not asked. But the designated representative, and I believe at the time the president of the company, the solvent services company, Mr. Nagpal, said he didn't know about Industrial Avenue. He didn't know about any contamination on Industrial Avenue. So for the designated representative of the corporation being acquired to make the concession that he didn't even know about this, I think calls into question, Your Honor's conclusion that maybe the due diligence wasn't very good. But the partners were still active, though. I understand that he was the point person who was designated, but that still doesn't preclude counsel from asking to speak to, what were there, four individual shareholders? True. That doesn't seem to be unreasonably burdensome in a multimillion-dollar transaction. No, certainly not, Your Honor. But if there was an effort to conceal the Industrial Avenue property, I mean, that certainly hasn't been made manifest yet. We haven't done a lot of this stuff. I mean, there hasn't been any discovery. But we all know that the problem with these CERCLA claims is that they can arise years later, sometimes decades after all operations have ceased. That's one of the problems with the reach of liability under the statute. But, Your Honor, the evidence that was relied upon, the undisputed evidence on the due diligence question relied upon by Judge Fogel and presented in the summary judgment papers below stated, and it's quoted in a couple of places, that Union Pacific told the sellers that it needed, quote, complete information about potential environmental liabilities because the information provided by sellers would be used to calculate the value of the environmental escrow shares and because the buyers would not assume the risks of other liabilities that were not encompassed by the environmental escrow and the cost-sharing allocation. That makes perfect sense to me. The problem is it's a high-risk transaction because of the nature of the business that they're acquiring. And it seems to me, and I don't mean to get hung up on this due diligence point, but it seems to me that if you're going to buy a business that's in the business of disposing of hazardous waste, that you want to do a super due diligence on what kinds of activities have been conducted on the property and any other places that this company may have done business, recognizing that it may be 30 years later, but a claim may come from a government regulatory agency or a private party in a PRP action, saying you're now liable for something that happened that far back. Well, I can't disagree with Your Honor, but I think that Union Pacific was also entitled to rely reasonably upon the good-faith disclosures by the sellers. And this site was not disclosed. In fact, the business plan, the confidential business plan that was presented to potential investors, including Union Pacific, talked about the company having its origins in 1974 at Berryessa Road. It didn't make any mention of the company having engaged in business prior to that time. And my point at the outset, Your Honor, was, well, that's true, I suppose, because the company didn't exist then. The partnership began its operations on Berryessa Road and made it a company. But, you know, if we look at what Mr. Cook said in his brief, he cited a piece of evidence from Mr. Nagpal about this appears in the opening brief of Mr. Cook on page 20. And Mr. Nagpal informed my client, we perceive the loan on the Lenfest property this was a piece of property that was disclosed, as being essentially a liability that belongs to the corporation. The loan amount is, in essence, being paid by the corporation. The partnership was being used as a vehicle to obtain this loan. Thus, it is our feeling that the debt on this property should be assumed as a debt belonging to the corporation, even though it is not reflected on the corporation's balance sheet. So there was this recognition that at the Berryessa property and the Lenfest property and so on that the corporation and the partnership were coexisting. And, indeed, the partnership continued to exist after the corporation was created. Indeed, the partnership filed a tax return a year after the merger was accomplished. So the partnership continued to exist. And by acquiring the company, by my client acquiring this company, I think it had every reason to believe that it was getting straight information on the disclosures that were being made about the operation. Alitoso, the partnership, as I recall from reading your briefs and the record, had to do with it actually owned a house or something in San Jose? They owned houses, rental houses. You know, Your Honor, if we look at that by analogy, there was no disclosure, as I recall, of the specific information about these houses that the partnership had because they were partnership assets. They weren't part of the corporation assets. They weren't being acquired. There was that level of distinction. But let's assume for a moment that the partners are sued by a subsequent owner of one of those rental houses for mold contamination. Or a buried oil tank or something. Or something like that. And the partners say, well, you know, we had those rental properties in the partnership. And, you know, we never told you about those properties because they were partnership assets, but we think those are covered, too, now. Counsel, is it — what's the record tell us? Is the partnership still in existence, or was it subsumed into the corporation? What do we know about the partnership? I don't know, Your Honor, whether the partnership continues to exist currently. It continued to exist at the same time that the corporation existed, and it continued to exist at least for a year after Union Pacific acquired the corporation. So the partnership was a separate entity. So the partnership transferred certain assets, but not all, to the corporation? The partnership transferred assets to the company, to Solvent Services Corporation, Inc., SSCI, and then SSCI was acquired by my client. But my client did not acquire partnership assets and did not take on partnership liabilities, except, as Judge Tallman indicated, I think it's fair to assume that with respect to the Berryessa Road operations, there was no effort to determine whether contamination or costs that might be incurred or liabilities that might arise down the because all of the environmental liabilities with respect to that site were made known to Union Pacific, and it evaluated the environmental liabilities on the basis of that disclosure. So in our view, Your Honor, Judge Fogel got this — got this just right. It was — it was the partnership that contaminated the industrial road property, not the company. The company didn't even exist at the time. Industrial road, it's undisputed, was never disclosed, and Union Pacific did not know about it. Another — another interesting fact is that — Counsel, let me ask. Yeah. The one thing that troubles me about what Judge Fogel did, though, is that he — he concluded, based on the extrinsic evidence, that nobody thought about Industrial Avenue, and I think that's fine to go that far, but then he, in essence, it seems to me, rewrote the agreement and said, in the absence of what could have been a line that should have been inserted, that the only properties covered by the representations and warranties in this agreement are as provided in an attached schedule, and then we'd have Berryessa and Lenfield listed, which would — would absolve the need to even be here today. He — he used that extrinsic evidence to do what I think the parole evidence rule forbids, which is to rewrite the actual language that the — that the parties used, which includes this formally occupied. Well, Your Honor, I don't agree with that. The — the statement that — that the parties didn't think about Industrial Road was a statement from Mr. Cook in his papers. That's what the judge cited, too. And so I believe the judge — that Judge Fogel did the right thing by saying, my job is to determine what the intent of the parties is manifested by this agreement. And how could the parties have intended to — to allocate liabilities related to a piece of property that was never owned by the corporation that was being acquired and was never even thought of? The — I mean, the parties went to this — this — this enormous difficulty of allocating environmental liabilities with respect to what was disclosed, what was known, and then the — the environmental investigations being done by — by Union Pacific's consultants. But if — if Industrial Road wasn't even part of that calculus, wasn't even known, not even known to — to Mr. Nagpal, then it — it certainly could not have been the intention of the parties to allocate liabilities with respect to that site. But that goes back to my question to Mr. Cook, and that is, how far can you go under the parole evidence rule in California? Can you look at that extrinsic evidence and conclude in the face of language which doesn't seem to me to be ambiguous, that the — that it must mean Industrial Avenue is excluded when it doesn't say that? Well, it doesn't say that it's included either, Your Honor. And I — and I think it is the judge's responsibility to — to look at what the parties intended based upon that agreement. And I agree with Mr. Cook that some extrinsic evidence is appropriate. But you do with the language of the California Supreme Court cases that basically say the parties are stuck with the language of the agreement that they wrote. And we can all now see that there was a better, clearer way to write this contract that would have avoided this entire lawsuit. But that's not what they wrote. Well, you know, I — I agree the parties are kind of stuck with the agreement that they wrote, with the language that's there. And I don't view Judge Fogle as having rewritten it. I think he was interpreting it to reflect the intent of the parties. The — the second argument I wanted to make, Your Honor, is not only that Judge Fogle got this right, but the notion that a party's representations and warranties can be used to benefit that party itself troubles me. The — the plaintiffs basically are saying UP is liable for our misrepresentations. And — and I — I think fairly read, the agreement doesn't contemplate that. I think it's a distortion of the agreement to do that. The third issue I'm running out of time here is that — that Mr. Cook has — has just asked the Court to assume that there has been, by the plaintiffs, a breach of a representation and warranty. I don't — I don't — first of all, I don't think that nondisclosure is a breach. It's — it's not that they misrepresented something. It is that they did not — they did not disclose the — the prior operations of the partnership at this — at this prior location. And — and finally, we — as we argued in the brief, the — the warranties and representations expired five years after the merger's effective date. And I'd be happy to take the — Your Honors, through that, if you wish. But it is covered — it is covered in the brief on page 23. Roberts. It's in the brief, yes. Gershengorn. Yes. Unless the — the Court has any other questions. Roberts. No further questions. Gershengorn. Thank you, Your Honor. Roberts. Mr. Cook, you have some reserve time. That — that comment about the partnership took me by surprise. I — I somehow assumed that the partnership ended when the corporation was founded, but that is not true, is it? The partnership filed its final tax return in 1991. The — the transaction closed on December 20th of 1990. There wasn't time to file their final tax return in 1990. All right. So there's a very short period. Very, very short overlap. All right. Now, but what about these other properties, these houses, which apparently were not transferred to the corporation? Is that right? Those were sold, and they're — one of them was sold, and one of them was retained by the — the individuals, but not its partners. The partnership has not continued to exist since 1991. The last act of the partnership effectively was to file its final tax return in the wake of the closure of this transaction in December of 1990. And that's — it's page — the — page 25, 24 to 25 of our opening brief. You say the corporation was not formed until 1990 or 1980? The corporation was formed in 1980. Eighty. Nineteen-eighty. But — but the partnership remained functioning for another 11 years. The partnership existed throughout the — the decade of the 1980s. What it — what it fundamentally did was to provide financing, and it — it owned some of the real — real properties, and it provided financing capabilities to the corporation, as — as indicated in the quotation from Mr. Nagpal that Mr. Barb just read. They were really merged together, essentially, as — not merged in a formal sense, but they were operating side by side in a fairly loosely separated pair of companies. Didn't the partnership go back to the 1970s? Partnership goes back to 1971. Right. When they were at Industrial Avenue. When they were at Industrial Avenue, yes. The — one of the questions that was raised by Mr. Barg is whether or not the rep and warranty in Section 3.17 pertains to the partnership as well as the corporation. I think we addressed that before. The — the brief that Union Pacific filed at page 53 says as follows. The reps and warranties in Section 3.17 and the alleged environmental violations disclosed in Schedule 3.17 implicitly related both to the companies and the partnership's operations. That's what Union Pacific says. And they're right. They just become too restrictive, given the nature of this contract, when they finish the sentence and say, at the Berryessa Road property. Well, that's the gloss that's being added to this lawsuit and was added by the court below to a contract that doesn't say this. Just as the contract doesn't say — doesn't call out Industrial Avenue as being the indemnified property, it doesn't call out Berryessa Road as being the indemnified property. The indemnities operate in accordance with their own terms. And the indemnities, among other things, do indeed cover the former partners for their own breach. That's conceded in the — in the briefs. It may be troubling to Mr. Barg or others or to Union Pacific now that they agreed to — to indemnify the partners against their own breach. But when the context of the transaction is these partners are retiring and want to get out of the business, that's how it works. Union Pacific is protected in the event that there's fraud, but that fraud is not alleged here. So it does cover them for their own breach, and that's how they allocated unknown liabilities. My time is up. Thank you. Thank you, counsel. The case just argued will be submitted for decision.
judges: Goodwin, O'scannlain, Tallman